**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| DeJuan Campbell, Laila Jewett, and Sebastian Mexico, on behalf of themselves and all others similarly situated,<br>Plaintiffs,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br>Defendant. | CLASS ACTION COMPLAINT<br><br>**DEMAND FOR JURY TRIAL** |

## I. INTRODUCTION

1. Plaintiffs bring this class action on behalf of athletes challenging new eligibility rules adopted by the National Collegiate Athletic Association ("NCAA") in June 2026 ("Age-Based Rule"), which impose unreasonable eligibility restrictions that arbitrarily and disparately cut short college athletes' ability to compete and thereby prohibit, cap, and otherwise effectively limit the compensation that Division I athletes may receive for the use of their names, images, likenesses, and athletic reputations ("NIL").

2. No one cares more about fair competition and fair eligibility rules than the athletes who leave their blood, sweat, and tears on the fields of competition. Unfortunately for those athletes, the NCAA is implementing eligibility rules that arbitrarily pick winners and losers before competition even begins. The NCAA has passed an "Age-Based Rule" that gives athletes five years of eligibility but unlike previous rules,[1] this rule "starts the clock" on an athlete's five years of eligibility when the athlete first enrolls or with the academic year following the athlete turning nineteen, whichever occurs first. There are only three exceptions for the new Age-Based Rule: (a) pregnancy, (b) official religious mission or similar service commitment, and (c) active military duty. Critically, for athletes such as Plaintiffs, the Age-Based Rule does not apply to athletes whose fourth season of collegiate eligibility was completed by spring 2026.

3. The new Age-Based Rule arbitrarily harms large swaths of athletes by depriving them of opportunities to compete and earn NIL. To the extent the Age-Based

[1] Under the former "Four-in-Five-Year Rule," athletes were allowed to compete during four seasons with five total years of eligibility. By operation of the Four-in-Five Rule, Division I college athletes were not allowed to fully use the fifth year of eligibility to compete.

Rule is meant to help college sports stay centered on college-aged athletes, the rule's strict eligibility clock, ironically, will have the effect of excluding many college athletes.

4. The Age-Based Rule restricts Division I athletes to a flat age-based five-year window of eligibility to compete in five seasons with limited exceptions, all of which are anticompetitive as proposed by the NCAA. The Age-Based Rule is applicable to all Division I sports and applies without exception to all student athletes who initially enroll full time at any college or university in the fall of 2027 or later. For students with remaining eligibility (under the former Four-in-Five Rule) after the 2025-2026 academic year, and prospects who initially enroll full time at any college or university during 2026-2027, Division I schools will apply the former Four-in-Five Rule or the Age-Based Rule, whichever is most beneficial to the student athlete. Student athletes who used their fourth (and final) season of competition under the former Four-in-Five Rule during 2025-2026 are not eligible for a fifth year of competition because the Age-Based Rule does not apply retroactively to them. These new rules are illustrated in the table below:[2]

| Student-athletes | Which eligibility rules apply |
|---|---|
| Student-athletes who used their final season of competition (under previous rules) during 2025-26. | No additional eligibility. |
| Current student-athletes with eligibility remaining (under previous rules) after the 2025-26 academic year. | Either the previous rules OR the new age-based model, whichever is most beneficial to the student-athlete. |
| Prospects who initially enroll full time at any college or university during 2026-27. | Either the previous rules OR the new age-based model, whichever is most beneficial to the student-athlete. |
| Prospects who initially enroll full time at any college or university in fall 2027 or later. | The age-based model only. |

5. Waivers are no longer available to extend eligibility, with exceptions only for the arbitrarily selected reasons of pregnancy, official religious mission or a similar service commitment, and active-duty military service, provided the student-athlete does not

[2] *See* https://www.ncaa.org/news/2026/6/23/media-center-division-i-adopts-age-based-eligibility-model.aspx.

participate in organized competition. There are no sport-specific exceptions or grace periods.

6. While age waivers may be granted due to pregnancy, religious mission or a similar service commitment, and military service, the Age-Based Rule eliminates hardship waivers and medical "redshirting,"[3] meaning athletes may no longer receive an eligibility waiver for season-ending medical injuries—a circumstance largely out of the athlete's control. In short, except for the three limited exceptions, the strict age-based clock makes no other exceptions for students who choose delayed enrollment or to take time out for any reason, including even serious family circumstances, injury, academic advancement from a junior college, or financial issues.[4] The Age-Based Rule thus deprives large swaths of student athletes from a full five years of competitive eligibility, specialized academic programming, compensation from NIL agreements, national exposure, and professional development pathways – while arbitrarily allowing exceptions for some.

7. Restricting the window during which college athletes can work and monetize their NIL in such a way limits free trade and severely impacts student athletes' earning power. Plaintiffs seek relief to strike down these unreasonable restraints and vindicate college athletes' rightful opportunity to compete for a full five years.

8. Plaintiffs challenge the NCAA's arbitrary restrictions that limit college athletes' competitive window to a five-year period based on age and transition provisions which allow

---

[3] "Redshirts," "Redshirting" and the "Redshirt Rule" are terms of art related to certain college athletes and the ways those athletes, under the former Four-in-Five Rule, could preserve a season of competition by not competing (or minimally competing), including Institutional Redshirts, Sport-Specific Exceptions, and Academic Redshirts.

[4] *See* https://www.ncaa.org/eligibility-center/division-i-age-based-eligibility-rules/ ("The Division I age-based eligibility rule shifts eligibility from a season-based and waiver-driven system to a time-based system with few exceptions.")

arbitrarily selected categories of exceptions to that rule but no others. The interplay of the arbitrarily set age window and the arbitrarily limited exceptions to the age window function not as a reasonable eligibility boundary but as an anticompetitive device.

9. The Age-Based Rule distorts the market for Division I athletics by penalizing academically eligible high-performing college athletes who may delay or to take time out for any reason other than pregnancy, military service, or missionary/service work, thereby forcing them to forfeit year(s) of potential competition and market value without any legitimate procompetitive justification.

10. The NCAA's decision to include three arbitrarily selected types of waivers defeats any credible justification for an age-based cut off. By starting the eligibility clock at age nineteen at the latest, the Age-Based Rule is effectively adding an age cap to college athletic participation. And because the NCAA allows exceptions, there will be college athletes whose age exceeds the age cap. There has never been a bright-line age cut off in the past. Thus, an athlete's specific age has never been and is clearly still not a true concern of the NCAA but instead is an arbitrary and pretextual excuse for excluding certain athletes while allowing others (who fit the arbitrary exceptions) to compete regardless of their age.

11. Now, the NCAA has imposed an arbitrary age cut-off and completely eliminated waiver categories that previously could extend or change an athlete's period of competition, yet other types of eligibility waivers still continue to exist. Without any justification (let alone a pro-competitive one), the NCAA has deemed pregnancy, military service and mission/service work to be categorically worthy of an age waiver while any other hardship or circumstance is not. Beyond the three exceptions, there will no longer be any care or concern on behalf of large swaths of student athletes as to their situations or

what is in their best interests – in direct contravention of the NCAA's stated mission to "create a safe and equitable environment that allows student-athletes to reach their full potential in academics, athletics, and life" and the NCAA's stated goal to "creat[e] opportunities for college athletes."[5] Indeed, while the NCAA insists it protects athletes from commercial exploitation, it continues to perpetuate and defend an anticompetitive system that arbitrarily and disparately prevents student athletes from accessing economic opportunities on a level playing field and blocks them from realizing the true market value of their athletic services and NIL rights. The result is a system in which young men and women – many of whom are from economically disadvantaged backgrounds – will be denied the compensation and opportunities the free market would otherwise provide.

12. The NCAA claims the Age-Based Rule will result in uniform and predictable treatment of student athletes. However, allowing the waivers for pregnancy, military service, and mission/service work, by definition, means that the treatment of student athletes will *not* be uniform and predictable for student athletes. Whether one agrees with the merits of these specific exceptions, the fact is that the NCAA can and does make exceptions to its rigid eligibility rules when it feels like doing so, underscoring the arbitrariness of the rule.

13. Notably, there is no objective understanding of what is meant by "college-age" since students of all ages attend college. College also traditionally lasts four years, not five. Moreover, the existence of exceptions to the Age-Based Rule also belies the purpose of

---

[5] *See* the NCAA's Return of Organization Exempt from Income Tax Form 990 for the 2016 calendar year, or tax year beginning 09-01-2016, and ending 8-31-2017. https://projects.propublica.org/nonprofits/organizations/440567264/201811719349300516/IRS990.

limiting college sports to people aged 19-24 (to the extent that is the goal). Because of the exceptions to the rule, there will be student athletes who exceed age 24. Furthermore, under the Age-Based Rule, some athletes' eligibility windows may begin before they enter college and may in certain situations end before the student graduates. Student athletes who in 2026 completed four out of their five years of eligibility to compete (under the former Four-in-Five Rule) are not eligible for a fifth year of competition at all, because the rule does not apply retroactively to them. In sum, the Age-Based Rule does not ensure that college sports are played by so-called college age athletes.[6]

14. Nor is the NCAA's vague and tired rhetoric of "protecting amateurism" a justification for the Age-Based Rule. Indeed, the NCAA has repeatedly been found to have violated federal antitrust law under the guise of protecting amateurism and consumer demand for college sports, and courts have repeatedly struck down its restrictive rules, including for example former restrictions on broadcast rights,[7] caps on entry-level coaches' salaries,[8] caps on financial aid awards,[9] and rules prohibiting athletes from receiving a share of revenue generated from NIL.[10]

---

[6] On July 31, 2026, Hon. Judge Sweeney in the District of Colorado granted a class-wide preliminary injunction against the NCAA, enjoining it from enforcing the Age-Based Rule against athletes who started college in 2022-23 and completed their fourth year of competition in the 2025-2026 season and were thus excluded from a fifth year of competing under the rule as it was written. *Wisne et al. v. Nat'l Collegiate Athletic Ass'n*, Case No. 26-cv-03063, Dkt. No. 38 (D. Colo. Jul. 31, 2026). The NCAA appealed the injunction Order. Case No. 26-1309, Dkt. No. 1 (Aug. 3, 2026).

[7] *See NCAA v. Board of Regents* 468 U.S. 85, 119 (1984).

[8] *See Law v. NCAA,* 134 F.3d 1010, 1021 (10th Cir. 1998).

[9] *See White v. NCAA*, No. CV 06-999-RGK, 2006 WL 8066803 (C.D. Cal. Oct. 19, 2006).

[10] *See O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015).

15. On June 21, 2021, the Supreme Court issued its landmark opinion in *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 112 (2021), affirming the district court's decision that the NCAA violated the Sherman Act with restraints on education related benefits that were patently and inexplicably stricter than was necessary to achieve the procompetitive benefits the league had demonstrated. *Id.* at 100. The Court also recognized that "[w]hen it comes to college sports, there can be little doubt that the market realities have changed significantly" and that college athletics have transformed into a multibillion-dollar enterprise in which student athletes are essential contributors entitled to share in the immense economic value they help to create. *Id.* at 93. In affirming the district court decision, the Supreme Court paved the way for student athletes to receive compensation for the use of their NIL.

16. Indeed, not long after the *Alston* opinion came out, the NCAA lifted its blanket prohibition on NIL compensation effective July 1, 2021, and the resulting NIL market has grown into a billion-dollar industry, valued at roughly $1.1 billion for football alone since 2024. In addition, the recent settlement in *House* between the NCAA, power conferences, and Division I athletes provides for billions of dollars in backpay to certain former college athletes, authorizes Division I schools to make direct cash payments of up to the applicable annual revenue-sharing cap per institution to their college athletes in Revenue Sharing, and allows student athletes to continue to sign NIL deals with third parties, subject to NCAA and conference standards and limitations.[11]

[11] To be clear, the *House* Settlement has no direct bearing on the claims in this complaint. The *House* Settlement excluded from its release any claims based on rules that did not exist at the time of filing for preliminary approval of the settlement. The Age-Based Rule was enacted after the settlement approval, therefore the injuries from the implementation of the Age-Based Rule are thus not released by the *House* Settlement.

17. These cases illustrate that the courts have continued to reject the NCAA's arguments that various restrictions have been necessary to protect "amateurism," or the popularity, success, and expansion of college sports. Indeed, after each time the NCAA has been forced to eliminate or modify its restraints, college sports have become more popular and successful, not less. A vague concept of "amateurism" or claims that the restrictions are necessary to the continued success of college sports cannot be an excuse to deprive student athletes of compensation for NIL. The Age-Based Rule, with its arbitrary effective age cut off and exceptions, interferes with student athletes' abilities to earn.[12] The Age-Based Rule is inexplicably stricter than necessary to achieve any procompetitive purpose.

18. The financial consequences are potentially extreme for student athletes. Unless they are eligible to compete, student athletes receive none of the up to the applicable annual revenue-sharing cap in payments that Division I universities are permitted to pay out to college athletes. They miss out on earning lucrative NIL opportunities, they lose out on academic scholarships, they lose out on national exposure, and they lose out on professional development pathways.

19. Harm to student athletes, such as DeJuan Campbell, Laila Jewett, and Sebastian Mexico, who competed in four of their five years of eligibility as of 2026, has already occurred and is irreversible. These college athletes have exhausted their eligibility

[12] If the NCAA's concern is that athletes will play professionally (e.g., with the National Football League) and then return to college to play, having an arbitrary age cut off does not address that concern. Similarly, an arbitrary age cutoff does not address the NCAA's purported desire to prevent multiple transfers by student athletes. But cutting off a college player for age-based and transition provisions while granting arbitrarily selected categories of exceptions to others, allows some student athletes to compete without regard to their age while forcing others to potentially forfeit years of competition and market value without any legitimate procompetitive justification.

under the old Four-in-Five Rule, and the new Age-Based Rule will not be extended retroactively to them. It is now likely too late for many to obtain access to a fifth competitive season and the NIL compensation that comes with it, and even those that may be able to belatedly join teams for a fifth season have had their negotiating and recruiting positions severely undermined. These college athletes have suffered measurable economic and competitive injuries for which damages under antitrust law are warranted. As noted, colleges have "flexibility" as to how currently enrolled students with eligibility remaining after the 2025-2026 academic year are treated. For those student-athletes, schools may apply the age-based model or continue with the former Four-in-Five Rule eligibility rules, whichever is most beneficial to the student athlete. There is no pro-competitive justification to treat athletes who had been subject to the former Four-in-Five Rule in disparate ways, denying one group of a fifth year of competition while giving the other group of athletes whatever is most beneficial to them.

20. For student athletes denied the ability to compete and earn NIL money by the Age-Based Rule, damages are accruing immediately because athletes are blocked from competition due to the NCAA's unjust and anticompetitive rules. Injunctive relief is imperative to ensure any competitive window and waiver system allowed for Division I athletes have a pro-competitive justification, are not overly restrictive, and are applied fairly rather than as a non-competitive means to arbitrarily and disparately benefit some—but not all—student athletes. Because collegiate careers are uniquely finite, the injury caused by the

Age-Based Rule, including its arbitrarily selected waiver categories, is not only ongoing but is also irreparable.[13]

21. These anticompetitive restraints are exploitative. By unreasonably and arbitrarily limiting Division I student athletes' eligibility, the rules restrict the athletes' opportunity to compete in the marketplace for Division I college athletics. By artificially curtailing athletic competition, the NCAA, through the Age-Based Rule, diminishes college athletes' economic opportunities and restrains competition in violation of the antitrust laws. Plaintiffs, accordingly, seek damages as well as declaratory and injunctive relief to redress and prevent these ongoing violations.

## II. JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. The Court also has jurisdiction over this matter under 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some of the members of the proposed classes are citizens of a state different from the Defendant.

23. Venue is proper because Defendant has agents and transacts business in this District as provided in 28 U.S.C. §§ 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22.

[13] "Courts have repeatedly found that college students suffer irreparable harm when they are denied the opportunity to play sports." *Ohio v. NCAA*, 706 F. Supp. 3d 583, 597 (N.D. W. Va. 2023).

24. This Court has personal jurisdiction over Defendant because, *inter alia*, it: (a) transacted business throughout the United States, including in this District; (b) participated in organizing intercollegiate athletic contests, and/or licensing or selling merchandise throughout the United States, including at least five institutions in this District; (c) had substantial contacts with the United States, including in this District; and (d) was engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Numerous NCAA Division I universities or colleges are found within this District, *e.g.*, University of Colorado Boulder ("CU Boulder", or ("CU"), Colorado State University, University of Denver, University of Northern Colorado, and the United States Air Force Academy.

25. Colorado officials have served on the NCAA's highest rulemaking bodies. CU Boulder Chancellor Philip DiStefano served on the NCAA Board of Governors — the Association's highest governance body — and simultaneously on the Division I Board of Directors, voting on major rulemaking including the Rice Commission basketball reforms, board restructuring, and the call for the 2021 constitutional convention.[14] CU Athletic Director Rick George served on the NCAA Division I Council (the primary Division I rulemaking body), the Council's Transfer Working Group, and the eighteen-member NCAA Working Group on Federal and State Legislation that produced the Association's

[14] CU Boulder Today, July 30, 2021. https://www.colorado.edu/today/2021/07/30/philip-distefano-ncaa-board-governors-convene-constitutional-convention; CU Boulder Today, July 8, 2021. https://www.colorado.edu/today/2021/07/08/philip-distefano-rick-george-discuss-name-image-likeness-rules.

NIL framework recommendations.[15] University of Northern Colorado President Emerita Kay Norton chaired the NCAA Division I Committee on Infractions, the body that adjudicates rules violations; her term 3 of 3 expires August 2027.[16]

26. The NCAA's championship operations have a deep Colorado footprint. The NCAA ice hockey championship was effectively born in Colorado: the Broadmoor Ice Palace (later the Broadmoor World Arena) in Colorado Springs hosted the first ten NCAA hockey championships (1948–1957) and eleven overall, the most of any venue.[17] The inaugural 1948 tournament was played entirely at the Broadmoor, and Colorado College won its national titles on home ice in Colorado Springs.[18] Denver hosted the 2008 Frozen Four at the Pepsi Center — with the University of Denver as host institution — as well as the 2007 West Regional.[19]

27. In basketball, the Pepsi Center/Ball Arena hosted NCAA men's tournament rounds in 2004, 2008, 2011, and 2023 (hosted by the Mountain West Conference), with Denver also selected for 2021 and 2025.[20] The 2012 NCAA Women's Final Four was held

---

[15] https://cubuffs.com/staff-directory/rick-george/298.

[16] https://www.ncaa.org/division-i/governance/committees/committee-on-infractions-roster/.

[17] List of NCAA Division I Men's Ice Hockey Champions, Wikipedia, https://en.wikipedia.org/wiki/List_of_NCAA_Division_I_men's_ice_hockey_champions (Broadmoor hosted the first ten tournaments and eleven overall, the most of any venue); Broadmoor World Arena (1938), Wikipedia, https://en.wikipedia.org/wiki/Broadmoor_World_Arena_(1938).

[18] 1957 NCAA Men's Ice Hockey Tournament, Wikipedia, https://en.wikipedia.org/wiki/1957_NCAA_men's_ice_hockey_tournament; see also Grand Forks Herald, New Arena the Latest Development in CC Hockey's Notable History (Oct. 10, 2019) (Colorado College won its 1950 and 1957 titles on home ice).

[19] 2008 NCAA Division I Men's Ice Hockey Tournament, Wikipedia, https://en.wikipedia.org/wiki/2008_NCAA_Division_I_men%27s_ice_hockey_tournament.

[20] Ball Arena, Wikipedia, https://en.wikipedia.org/wiki/Ball_Arena.

at the Pepsi Center.[21] And the NCAA Skiing Championships have been held at Colorado venues repeatedly, with Steamboat Springs hosting more NCAA skiing championships than any other single site and CU Boulder serving as host school more than any other institution.

28. Colorado's General Assembly has legislated directly at the NCAA's rulemaking authority. Senate Bill 20-123, signed March 20, 2020 and codified at Colo. Rev. Stat. § 23-16-301 et seq., declares that every Colorado student athlete has the right to be paid for use of name, image, and likeness and to hire representation, and that no athlete may be compelled to forfeit those rights to participate in intercollegiate athletics.[22] The statute regulates the NCAA by name: "athletic association" is defined to "include[] the National Collegiate Athletic Association or any successor organization."[23] Legislation reflects understanding that NCAA does business in the state of Colorado.

29. The NCAA has litigated its rules in Colorado courts for five decades.[24]

30. The NCAA's conduct alleged herein occurred within the flow of interstate commerce, including in this District, and was intended to and did have a direct and

[21] 2012 NCAA Division I Women's Basketball Tournament, Wikipedia, https://en.wikipedia.org/wiki/2012_NCAA_Division_I_women%27s_basketball_tournament.

[22] S.B. 20-123, 72d Gen. Assemb., 2d Reg. Sess., ch. 35, 2020 Colo. Sess. Laws (signed by Gov. Jared Polis, Mar. 20, 2020); legislative declaration at § 1 ("every student athlete enrolled at an institution of higher education in this state has a right to: (a) Be paid for the use of the student athlete's name, image, and likeness; and (b) Hire one or more persons to represent the student athlete's interests"; "a student athlete may not be compelled to forfeit these rights in order to participate in intercollegiate athletics"). SB20-123 Compensation & Representation Of Student Athletes | Colorado General Assembly.

[23] Colo. Rev. Stat. § 23-16-301(1)(c) ("'Athletic association' means an athletic association, conference, or other group or organization with authority over intercollegiate athletics. The term includes the National Collegiate Athletic Association or any successor organization.").

[24] *See Bloom v. NCAA*, 93 P.3d 621 (Colo. App. 2004); *Colorado Seminary (University of Denver) v. NCAA*, 417 F. Supp. 885 (D. Colo. 1976), aff'd, 570 F.2d 320 (10th Cir. 1978); *Fontenot v. NCAA*, No. 1:23-cv-03076 (D. Colo.).

substantial effect upon such commerce. The NCAA's professional and commercial presence in Colorado is pervasive and long-standing.

## III. PARTIES

### A. Plaintiffs

31. Plaintiff DeJuan Campbell is a resident of Virginia. He played basketball for two years at Western Carolina University and two years at the University of California, Berkeley. He finished his fourth year of eligibility and graduated in 2026. But for the NCAA's disparate application of the new Age-Based Rule, Mr. Campbell would be eligible for a fifth year of competition and would receive another year of compensation associated with his status and marketability as a Division I basketball player.

32. When the Court in *Wisne* granted a preliminary injunction to the certified Rule 23(b)(2) class, of which Campbell is a member,[25] Campbell promptly sought guidance from the Assistant Athletics Director of Compliance at his current institution. He was informed that the school plans to wait until resolution of the NCAA's appeal of the preliminary injunction order before determining what steps to take with regard to athletes in Campbell's situation.

33. Mr. Campbell was also informed that the NCAA has told schools it does not plan to open the transfer portal, which, for athletes like Campbell who did not enter the portal by the April 2026 deadline to do so (because they were under the impression that they

[25] Campbell is a member of the *Wisne* injunctive class because he is a person in the United States who began to play in collegiate sports in the 2022-23 season, competed in NCAA Division I sports, and completed four years of eligibility as defined by the NCAA's prior rules by the conclusion of the 2025-26 season. *See Wisne et al. v. NCAA*, Case No. 26-cv-03063-CNS-KAS, Dkt. No. 37, at 17 (D. Colo. Jul. 31, 2026).

had exhausted their eligibility under the old rules), means that they cannot now enter the portal to seek out a fifth year of competition at another school.

34. The response Mr. Campbell received from his school's Assistant Athletics Director of Compliance illustrates the chaos and confusion the NCAA is perpetrating and shows how damages continue to accrue for athletes like Mr. Campbell because he remains without opportunity to compete despite courts, coaches, and schools attempting to help him play another season.

35. Plaintiff Laila Jewett is a resident of Florida. She competed in NCAA Division I women's basketball during four seasons: at the University of Central Florida during 2021-22, 2022-23, and 2023-24, and at Georgetown University during 2025-26. Her participation during the 2021-22 season was limited to nine games because of COVID-19 and asthma-related complications. She did not compete during the 2024-25 season while addressing family circumstances following the death of her brother. During her collegiate career, Ms. Jewett received athletic scholarship support and NIL compensation associated with her status and marketability as a Division I basketball player.

36. Ms. Jewett is currently enrolled at the University of Florida as a graduate student. Florida has committed in writing that, if she is declared eligible to compete during the 2026-27 season, she will receive a roster spot, a full athletic scholarship, and significant revenue-sharing compensation.

37. Under the NCAA's challenged transition rules, Ms. Jewett is not presently eligible for an additional season of competition during 2026–27. Unless she is declared eligible, she cannot compete for Florida or receive the scholarship and revenue-sharing compensation described above.

38. Plaintiff Sebastian Mexico is a resident of Massachusetts. He played DI baseball for four years total with Fordham University and Louisiana Tech University. He was not enrolled in any college and did not play for any team for the 2023-2024 season in order to work full-time to pay for his education and train at Driveline Baseball in Arizona. Driveline Baseball is the premier data-driven baseball player development organization in the world and is widely praised as a data-driven pioneer in player development. It is credited with helping numerous pro athletes increase velocity and bat speed. Mr. Mexico exhausted four years of Division I athletic eligibility by the end of the 2025-2026 academic year. During Mr. Mexico's collegiate career, he received athletic scholarship support and NIL compensation associated with his status and marketability as a Division I baseball player.

39. Under the NCAA's challenged transition rules, Mr. Mexico is not presently eligible for an additional season of competition during 2026–27. Unless he is declared eligible, he cannot compete for any DI school or receive the scholarship and revenue-sharing compensation described above.

**B. Defendant**

40. The National Collegiate Athletic Association is a self-described unincorporated not-for-profit educational organization founded in 1906. It maintains its principal place of business in Indianapolis, Indiana.

41. The NCAA is the governing body of college sports with approximately 1,100 member colleges and universities throughout the United States, including institutions in the District of Colorado. It is a member-controlled organization that claims it exists to regulate college sports and protect student-athletes. According to Article 1 of the NCAA Constitution, its stated purpose is to keep intercollegiate athletics tied to the educational

experience and to preserve a supposed distinction between college athletics and professional sports. But despite that stated mission, the NCAA oversees a massive commercial enterprise that generates billions of dollars from the labor and performance of college athletes.

42. There are 1,086 active NCAA member schools, and these schools are organized into three Divisions. Divisions I, II, and III. As a practical matter, any academic institution that wishes to participate in any meaningful way in the highest and most popular levels of college sports must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members.

43. As the NCAA acknowledged in *Alston*, 594 U.S. at 90, its member schools collectively enjoy a monopoly in the market for student-athlete services, such that its restraints can and do harm competition. With such power, the NCAA has grown into what one court has described as a "financial behemoth," with "revenues often exceeding $1 billion annually." *Johnson v. NCAA*, 108 F.4th 163, 170 (3d Cir. 2024).

44. Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports. The Constitution and Bylaws were adopted by votes of the member institutions and may be amended by votes of the member institutions. The NCAA is responsible for the passing, implementation, and enforcement of the Age-Based Rule.

45. The NCAA generates billions of dollars largely because of the massive commercial success of Division I FBS football and men's basketball. Together, those sports rank among the most profitable entertainment products in the country. In the 2024–2025 season alone, the NCAA reported approximately $1.56 billion in revenue, driven overwhelmingly by the talent, labor, and marketability of college athletes. Yet despite

creating that value, athletes have long been restricted by NCAA rules from sharing fairly in the economic success they help produce.

46. In its Consolidated Financial Statements for the fiscal year ending August 31, 2025, the NCAA reported total revenues of $1,566,533,639.[26]

### C. Agents and Co-conspirators

47. The anticompetitive and unlawful acts alleged against the Defendant in this Complaint were authorized, ordered, or performed by Defendant's officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendant's businesses or affairs.

48. Each of Defendant's agents operated under the authority and apparent authority of its principals.

49. Various persons and/or firms not named as defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statement in furtherance thereof.

## IV. BACKGROUND

### A. The Multi-Billion-Dollar Division I College Athletics Industry

50. As noted above, Division I college athletics is a multi-billion-dollar industry. For many schools, coaches, athletic directors, agents, and advertisers, the college sports industry is incredibly profitable. Indeed, each of the Power Four (or "P4") Conference commissioners are making more than $2.6 million annually, with the highest paid—former Big Ten commissioner, Kevin Warren—reportedly earning $6.83 million, much of it coming

[26] NCAA Consolidated Financial Statements August 31, 2025. https://ncaaorg.s3.amazonaws.com/ncaa/finance/2024-25NCAAFIN_FinancialStatement.pdf.

in the form of a bonus after securing the conference's historic $7 billion media rights deal.[27] The salaries for the "top" head coaches in Football Bowl Subdivision football ("FBS Football") and Division I men's basketball exceed $13.2 million per year,[28] and compensation packages for the top head coaches in Division I women's basketball exceed $4 million per year.[29] This compensation continues to rise, with salaries for coaches in the Power Four Conferences increasing in 2023 by a "whopping 14.3% . . . from 2022."[30] The head football or basketball coach is the highest-paid public employee in states throughout the country, dwarfing the salaries of college presidents and all other state employees.[31] The profligate spending on coaches is exemplified by the fact that Texas A&M University went so far as to—when firing its head football coach, Jimbo Fisher, in November 2023—agree to pay Fisher more than $76 million to buy out the remainder of his contract.[32] In other words, Texas A&M paid Fisher $76 million to *not* coach at the school.

---

[27] Daniel Libit, *Big Ten cut Kevin Warren a Big Bonus—just not Jim Delany Big,* Sportico (May 6, 2025), https://www.sportico.com/leagues/college-sports/2025/big-ten-kevin-warren-bonus-jim-delany-1234851527/.

[28] Robby Kalland, *College football's highest-paid coaches: Curt Cignetti, Lane Kiffin deals shake up the top 10,* CBS Sports (Apr. 28, 2026), https://www.cbssports.com/college-football/news/college-football-highest-paid-coaches-2026-curt-cignetti-lane-kiffin/.

[29] Michael Voepel, *South Carolina makes Dawn Staley highest-paid women's hoops coach,* ESPN (Jan. 17, 2025), https://www.espn.com/womens-college-basketball/story/_/id/43454366/south-carolina-makes-dawn-staley-highest-paid-women-hoops-coach.

[30] Tom Schad and Steve Berkowitz, *Why College Football is King in Coaching Pay–Even at Blue Blood Basketball Schools*, USA Today (October 3, 2023), https://www.usatoday.com/story/sports/ncaaf/2023/10/03/college-football-coach-pay-is-soaring-even-at-basketball-schools/70924373007/.

[31] Charlotte Gibson, *Who's Highest-Paid in Your State?*, ESPN (last accessed on November 30, 2023), https://www.espn.com/espn/feature/story/_/id/28261213/dabo-swinney-ed-orgeron-highest-paid-state-employee.

[32] Pete Thamel, *Jimbo Fisher Fired by Texas A&M, to Receive Record Buyout*, ESPN (Nov. 12, 2023), https://www.espn.com/college-football/story/_/id/38880082/jimbo-fisher-expected-fired-texas-sources-confirm.

51. The entire multi-billion-dollar machine that is college sports is fueled by the efforts of the student-athletes. And while substantial progress has been made recently securing the rights of those athletes to at least some portion of the enormous profits flowing through the industry, they still receive only a fraction of those proceeds in the form of newly allowed Revenue Sharing and NIL payments.[33]

### B. The U.S. Supreme Court's 2021 Decision in *Alston* Paves the Way for Student Athletes to Earn Compensation Related to Athletic Competition

52. Historically, the NCAA's amateurism rules severely restricted student-athletes' ability to earn compensation related to athletic competition. However, in 2021, the United States Supreme Court in *Alston*, issued a unanimous opinion affirming the district court's decision to enjoin NCAA's restraints on education related benefits as consistent with established antitrust principles. *Alston*, 594 U.S. at 107. The Court rejected the NCAA's proposal for "a sort of judicially ordained immunity from the terms of the Sherman Act for its restraints of trade," in an attempt to resist a rule of reason analysis. *Id.* at 94-96. Under the rule of reason analysis, the Court endorsed the "demanding standard" applied by the lower court in reviewing the procompetitive rationale for the NCAA's restraints: whether it was "'patently and inexplicably stricter than necessary' to achieve the procompetitive benefits the league had demonstrated." *Id.* at 101 (internal citations omitted).

53. In response to *Alston* and other litigation, the NCAA began allowing student-athletes to obtain compensation for NIL. And in June 2025, pursuant to a settlement agreement in *House* the NCAA allowed collegiate institutions to pay student-athletes directly

[33] And even the hard-fought NIL shares are currently under attack in litigation and on appeal. *See* Notice of Appeal, *In re College Athlete NIL Litigation*, Docket No. 4:20-cv-03919 ECF No. 982 (9th Cir. June 11, 2025).

through Revenue Sharing. The *House* Settlement is yet further recognition of the ongoing evolution of the labor market for NCAA Division I college athletes, and recognition that student athlete eligibility to compete carries with it substantial economic value.

### C. Lawsuits Challenging the NCAA's Former Four-in-Five Rule Eligibility Restrictions and Corresponding Opportunities for NIL and Revenue Sharing Lead to the NCAAs Rigid and Anticompetitive Age-Based Rule

54. As noted above, the Age-Based Rule replaces the NCAA's former Four-in-Five Rule which had been in place for almost fifty years. Under that rule, a Division I athlete had exactly five years of eligibility from their initial full-time college enrollment to complete four seasons of competition.[34] Under the Four-in-Five Rule, athletes could only compete for four years during their five years of eligibility.[35] The Redshirt Rule enabled a student-athlete who sat out of all official competitions for a full academic year to preserve one of their four years of playing eligibility. While they could not play in games, so-called "redshirts" could still practice, use team facilities, attend meetings, and retain their athletic scholarships. A redshirt year could be granted to an athlete for any number of reasons including, for example, so that the athlete could: develop physically; adjust to college academics; recover from minor injuries; learn a new system or position; navigate high competition at their position; or recover from a season-ending injury early in the year.[36]

55. Then and now, a Division I school that deviates from NCAA rules may be subject to severe sanctions. And the NCAA imposed substantial penalties on member

---

[34] NCAA Bylaw 12.6.1. *See NCAA*, 2025-26 NCAA Division I Manual, Bylaw 12.6.1, at 46 (2025) https://ncaapublications.com/products/2025-2026-ncaa-division-i-manual.

[35] NCAA Bylaw 12.6 Seasons of Competition: Five-Year Rule. *NCAA*, 2025-26 NCAA Division I Manual, Bylaw 12.6, at 46 (2025) https://ncaapublications.com/products/2025-2026-ncaa-division-i-manual.

[36] https://www.ncsasports.org/what-is-a-redshirt-freshman (last accessed 6/4/2026).

institutions found to have violated the Four-in-Five Rule's requirements, including significant fines, forfeiture of wins and titles, scholarship reductions, and, in extreme cases, the complete foreclosure from NCAA competition in the sport at issue.

56. Athletes filed dozens of lawsuits in state and federal courts across the country challenging the NCAA's uneven treatment of athlete eligibility under the Four-in-Five Rule, which correspondingly impacted their NIL, Revenue Sharing, and scholarship opportunities.

57. In response to the extensive legal challenges and resulting unpredictable and inconsistent results, the NCAA attempted to implement *ad hoc* piecemeal adjustments to the application of eligibility rules to select groups of athletes. But the NCAA's piecemeal approach only resulted in further inequality and unpredictability for college athletes. The NCAA's rush to implement an ostensibly one-size-fits all age-based eligibility rule does not fit all but, instead, simply imposes a new and different set of unreasonable and arbitrary restrictions that arbitrarily and disparately cut short college athletes' ability to compete and earn NIL.

### D. The Age-Based Rule Imposes Unreasonable Restrictions that Arbitrarily Cut Short College Athletes' Ability to Compete and, Correspondingly, to Earn NIL, Be Compensated Through Revenue Sharing, and Have Access to Scholarships

58. Although athletes may now potentially compete in all five years of their five-year eligibility window, that eligibility is cut off arbitrarily and disparately due to age. Moreover, the rigid age-capped window is only rigid for some, with three unilaterally chosen exceptions that result in some but not all student athletes being capped by age. As a result, some but not all student athletes will be able to take advantage of their full five years of eligibility and earn NIL. For some, the eligibility window will begin before they have

even started college and may end before they finish. In addition, the Age-Based Rule also does not apply to student athletes who completed four years of competition in 2026 or earlier, out of their five years of eligibility under the former Four-in-Five Rule. Thus, those students are unfairly and arbitrarily deprived of the opportunity to compete for a fifth year, and the corresponding opportunities for NIL.

59. As discussed above, the Age-Based Rule allows for three arbitrarily selected exceptions to the age cap: pregnancy, missionary/service work, and military service. Student athletes with access to those waivers can compete regardless of their age. Other athletes, who may be required to delay or take time away from competition for valid and serious reasons such as injury, family circumstances, financial issues, and time to develop, will not be entitled to a waiver, and will be blocked from competing due to their age or otherwise lose years of eligibility. They will not be able to take full advantage of their five years of eligibility, and they will lose out on opportunities for NIL.

60. By arbitrarily restricting student athletes' eligibility window based on age – but allowing exceptions that allow some to evade the age cap – the NCAA arbitrarily forecloses thousands of athletes from competing for a full five years and having corresponding opportunities for scholarships and NIL money.

61. Put simply, the Age-Based Rule limits athletic careers and unlawfully restrains the market for college athletes' services. As an example, an athlete who turns 19 in July of 2027 but delays going to college for a year to care for an elderly parent, save money to pay for college, or recover from a serious illness or injury, will be subject to the Age-Based Rule and will have lost a year of his or her eligibility to play Division I sports and earn compensation before even entering college. As another example, an athlete who is 19

in July of 2027, enters college in 2027, and competes in a Division I sport for a year as a freshman, but who must take two years off for any reason other than pregnancy, mission/service work, or military service, loses two years of eligibility. If that athlete returns to college as a sophomore and wants to compete in Division I sports, he or she now only has two years of eligibility left to compete.

62. Under the new Age-Based Rule, an athlete who entered college in 2022 and competed in a Division I sport for four seasons by the end of the 2025-2026 academic year, exhausted his or her four years of competition out of five years of eligibility under the former Four-in-Five Rule. That athlete is not entitled to compete in the fifth year of competition made possible by the Age-Based Rule, because the Age-Based rule allowing a fifth year of competition does not apply retroactively to that athlete. The athlete is thus deprived of the opportunity for NIL and scholarships. Yet other athletes who were subject to the old Four-in-Five Rule have the option to take advantage of the Age-Based Rule's fifth year to compete. There is no procompetitive justification for such disparate treatment.

63. The Age-Based Rule thus bans athletes from competing not because of injury, misconduct, or academic ineligibility, but because of limits unilaterally and arbitrarily imposed by the NCAA. Plaintiffs seek relief under federal law to strike down these unreasonable restraints and vindicate college athletes' rightful opportunity to compete on even grounds with other athletes throughout an eligibility window that is not arbitrary and anticompetitive.

64. Indeed, whatever the intention behind the Age-Based Rule, the impact on Division I Athletes continues to be anticompetitive. Although Division I athletes are prospectively no longer limited to only four seasons of competition within a five-year

eligibility window, the Age-Based Rule still imposes unreasonable age and waiver restrictions that arbitrarily and disparately cut short college athletes' ability to compete in Division I Sports and thereby also deprives them of athletic scholarships and corresponding—and financially lucrative—NIL opportunities.

### E. "Amateurism" – The NCAA's Pretextual Justification for Its Anticompetitive Restraints

65. As the world of college athletics has evolved from a truly amateur student-athlete market to a multi-billion-dollar profit machine, the NCAA has repeatedly claimed its evolving rules are necessary to protect principles of "amateurism" and to preserve "a clear line of demarcation between intercollegiate athletics and professional sports." However, as discussed above, courts have time and again rejected the NCAA's attempts to justify[37] anticompetitive restrictions, despite its position that they were necessary to protect amateurism. Moreover, there has never been a strict age cutoff for eligibility in the decades that the NCAA has been claiming restrictions are needed to protect amateurism. In any event, the NCAA still allows three categories of athletes to exceed the age requirement – further indicating that restricting age is not necessary to protect "amateurism".

66. Tellingly, for the entire web of dominant non-athlete entities that profit from "amateur" college athletics, the NCAA feels no need to artificially restrict *their* access to profit and competition with one another in the market. For instance, athletic directors, coaches, assistant coaches and coordinators, and agents, can all make millions of dollars every year in college sports, yet the NCAA does nothing to regulate or rein in eligibility or

---

[37] *See* Rule 20.9.1.2 of the 2025-26 NCAA Division I Bylaws.

pay for these positions.[38] If the NCAA's presumption that a flood of money would corrupt collegiate athletics, the organization's lack of action related to these positions is telling. Notably, and not accidentally, when it comes to restraining competition and establishing rules that ostensibly are intended to protect amateurism or the principles of college competition, the NCAA has decided it is the athletes, not other profit-recognizing wings of the market, that have to literally pay the price, further exemplifying that the NCAA's justifications are pretextual.

67. In short, the amateurism argument has become a hollow, go-to strawman for the NCAA to justify limiting student athlete opportunity while continuing to allow the NCAA and others to exploit and rake in billions of dollars in profit from the student athletes' labor.

### F. The Commercial Nature of Division I Sports and the Transactions Between it and Division I Student Athletes

68. Division I athletes are employees in all but name.

69. The transactions between the NCAA, member schools, and college athletes are commercial, and fall squarely within the reach of the Sherman Act. As United States Supreme Court Justice Kavanaugh has aptly explained:

> [Historic traditions of college sports] cannot justify the NCAA's decision to build a massive money-raising enterprise on the backs of student athletes who are not fairly compensated…Nowhere else in America can businesses get away with agreeing not to pay their workers a fair market rate on the theory that their product is defined by not paying their workers a fair market rate. And

[38] Tom Schad and Steve Berkowitz, *How skyrocketing salaries help draw sitting head coaches to Power Four,* USA Today, (Dec. 11, 2024) https://www.usatoday.com/story/sports/ncaaf/2024/12/11/assistant-coaches-power-four-salaries/76502166007/; Paula Lavigne, *'Street agents' exploiting athletes in NIL deals, coaches warn,* ESPN (Feb. 23, 2026) https://www.espn.ph/college-football/story/_/id/47976859/street-agents-exploiting-athletes-nil-deals-coaches-warn.

> under ordinary principles of antitrust law, it is not evident why college sports should be any different. The NCAA is not above the law[39]

## V. THE RELEVANT MARKETS

70. The relevant markets are the nationwide markets for the labor of NCAA Division I college athletes in the various sports in which they compete. These include: Acrobats and Tumbling (Women's); Baseball (Men's); Basketball (Men's & Women's); Beach Volleyball (Women's); Bowling (Women's); Cross Country (Men's & Women's); Equestrian (Women's); Fencing (Men's); Field Hockey (Women's); Flag Football (Women's); Football (Men's); Golf (Men's & Women's); Gymnastics (Men's & Women's); Ice Hockey (Men's & Women's); Individual Tennis (Men's & Women's); Lacrosse (Men's & Women's); Rifle (Co-Ed); Rowing (Women's); Rugby (Women's); Skiing (Men's & Women's); Soccer (Men's & Women's); Softball (Women's); Stunt (Women's); Swimming and Diving (Men's & Women's); Tennis (Men's & Women's); Track and Field – Indoor (Men's & Women's); Track and Field – Outdoor (Men's & Women's); Triathlon (Women's); Volleyball (Men's & Women's); Water Polo (Men's & Women's); and Wrestling (Men's & Women's).

71. In these labor markets, current and prospective college students compete for roster spots on their respective Division I sports teams. The NCAA Division I member institutions compete to obtain and retain the best Division I athletes in each sport by providing in-kind benefits, such as scholarships, access to academic programs, access to training facilities, instruction from premier coaches, housing and food allowances.

---

[39] *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 112 (2021) (Kavanaugh, J., concurring).

72. On its website, the NCAA describes Division I as the "Biggest Stage in College Sports" with the "highest level of NCAA competition" and where "student-athletes benefit from tremendous support—including athletic scholarships up to and including full rides."

73. According to the NCAA website, this is where student-athletes "find the most comprehensive student-athlete benefit programs[.]"[40] There are over 360 Division I member schools and over 6,000 teams within the United States, with a median undergraduate enrollment of over 8,700 student athletes comprising 37% of all NCAA student-athletes.[41]

74. There is no similar, equal, or alternative market to NCAA Division I for any Division I sport. The NCAA's Division I is the pinnacle for elite college sports in the relevant markets. Division I athletics constitute a distinct labor market from any other divisional (e.g., Divisions II and III) or professional counterpart (e.g., the NBA or MLB) for Division I athletes.

75. Only Division I member institutions and programs have the ability to engage in Revenue Sharing with student-athletes.[42] No other NCAA division can offer revenue sharing to student athletes. Nor does any other college level athletic association allow Revenue Sharing with student-athletes, including the National Junior College Athletic Association ("NJCAA") and the National Association of Intercollegiate Athletics ("NAIA").

---

[40] NCAA Division I homepage, https://www.ncaa.org/division-i/.
[41] *Id.*
[42] Direct institutional revenue sharing is currently exclusive to Division I athletes. *See* https://www.ncsasports.org/blog/what-is-ncaa-revenue-sharing.

76. In contrast to collegiate athletics, no professional league offers access to academic programs or opportunities to attain degrees in higher education while participating in sports. No other division or association can offer an adequate substitute for a Division I program.

77. Organizations such as the NAIA "have not proved to be viable substitutes [for the NCAA], that major professional leagues do not provide competitive options for most college aged talent, and that barriers to entry prevent viable alternatives from emerging for athletes' services."[43] Additionally, in *O'Bannon*, the 9th Circuit found "very few athletes talented enough to play FBS football or Division I basketball opt not to attend an FBS/Division I school; hardly any choose to attend an FCS, Division II, or Division III school or to compete in minor or foreign professional sports leagues, and athletes are not allowed to join either the NFL or the NBA directly from high school."[44] No other organization or league can offer the NCAA's "unique bundles of goods and services that include not only scholarships but also coaching, athletic facilities, and the opportunity to face high-quality athletic competition."[45]

78. The relevant geographic market is the United States. NCAA member institutions that participate in each respective NCAA Division I sport are located throughout the United States. All Division I teams are located in the United States.

---

[43] *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1067 (N.D. Cal. 2019).
[44] 802 F.3d 1049, 1056 (9th Cir. 2015).
[45] *Id.*

## VI. THE NCAA'S MARKET POWER

79. The NCAA has both monopsony power over the services of Division I college athletes and monopoly power over the performance and broadcasts of Division I college sports in the relevant markets alleged herein.

80. The NCAA has control over price and output in all NCAA Division I athletics.

81. The NCAA has acknowledged in previous litigation that it controls the market for college athletes, and courts have recognized the same.[46]

## VII. ANTICOMPETITIVE EFFECTS

82. Confirming well-established economic antitrust principles, the Supreme Court has explained: "Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'"[47]

83. Under binding Supreme Court law: "[T]he finding of actual, sustained adverse effects on competition [in those areas where Plaintiffs participate] is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis." *Id.* at 460-61.

---

[46] *See Alston*, 594 U.S. at 109 (Kavanaugh, J., concurring) ("The NCAA acknowledges that it controls the market for college athletes"); *Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756, 762 (E.D. Tenn. 2024) ("The NCAA's market power over Division I athletics is undeniable.").

[47] *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460, 106 S. Ct. 2009, 2019, 90 L. Ed. 2d 445 (1986).

84. The NCAA enacts and enforces rules that it claims promote fairness and the well-being of student-athletes while preserving true athletic amateurism. These rules are adopted through the NCAA Division I Council and member institutions, effectively making the rules the practical equivalent of horizontal agreements among the NCAA and the member institutions who compete against one another for the labor of student-athletes.

85. The misconduct alleged in this case has multiple market effects: (a) NCAA's Age-Based Rule has "actual, sustained adverse effects on competition"; (b) there is direct evidence that NCAA and its members have a monopoly level of market power; and (c) there is circumstantial evidence that NCAA has a monopoly level of market share in a properly defined antitrust relevant market.

86. The Age-Based Rule restricts the labor market and thus plainly harms athletes. Implementation of the Age-Based Rule will reduce output, decrease wages, and decrease quality by decreasing the number of qualified, talented athletes. Moreover, without these restrictions, more athletes would receive scholarships, and many would be paid additional compensation by schools and conferences for their NIL rights and athletic services. Instead, the NCAA, through its arbitrary eligibility restrictions, has suppressed what the market would otherwise pay these athletes, many of whom come from economically disadvantaged backgrounds.

87. The damage is even more significant because only a small fraction of athletes have the ability to participate in paid programs outside of the NCAA. For most athletes, their NCAA eligibility represents their only real opportunity to benefit financially from their athletic talent. Once that window closes, the opportunity is gone for good. The harm is plainly irreparable.

88. Absent Plaintiffs' recovery and injunctive remedy in this case, there are no legally cognizable and economically interchangeable alternative employment sources for Plaintiffs and the putative class members compared to the NIL opportunities foreclosed by application of the unjust and anticompetitive eligibility rules challenged in this case.[48]

89. Although the NCAA is organized as a nonprofit organization, the transactions between the NCAA, member schools, and college athletes are plainly commercial in nature. These arrangements directly impact athletes' earnings while generating enormous revenue for many schools.

90. Blocking and arbitrarily restricting qualified athletes from participating unfettered in nationwide labor markets for Division I college athletes is an anticompetitive restraint having direct anticompetitive effects on the student athletes themselves, including Plaintiffs and the class members. But the NCAA's eligibility restrictions also hurt general school-to-school competition by limiting the supply of athletes in the overall "labor" market for college athletes; this "labor" foreclosure further concentrates power in schools and conferences that have established dominance over the recruiting pool. With fewer eligible athletes on the market, dominant schools and conferences do not have to face competition from other emerging programs that could better compete and may wish to bring on athletes such as Plaintiffs who are barred from play due to the Age-Based Rule's arbitrary age cap and waiver restrictions.

---

[48] The NIL market is booming—projected to reach $2.82 billion in 2026-27. *See The Annual Opendorse Report*, Opendorse (2025), https://biz.opendorse.com/wp-content/uploads/2025/07/NIL-at-Four-Monetizing-the-New-Reality_Final.pdf.

## VIII. ANTITRUST ALLEGATIONS

91. Defendant's conduct described herein consists of an effective effort to unlawfully maintain and protect monopoly levels of market power and supracompetitive profits at the expense and exploitation of Plaintiffs and putative class members. Specifically, the NCAA's imposition and enforcement of unjustified and anticompetitive eligibility restrictions has resulted and will continue to result in diminished opportunities and aggregate pay for athletes seeking to compete in NCAA sports programs eligible for NIL.

92. As noted above, the relevant market for purposes of this case is the labor market for Division I college athletes.

93. The relevant geographic market is the United States, and the NCAA and its member institutions are located in that geographic market.

94. College athletes compete to earn spots on NCAA Division I athletic teams and NCAA member institutions compete with other institutions to attract and secure top-level college athletes. NCAA member institutions secure college-athletes through the provision of various in-kind benefits, including full and partial scholarships, advanced academic programing, access to state-of-the-art training and rehabilitation facilities, and premier instruction from knowledgeable coaching staffs.

95. Participating in NCAA Division I athletics provides significant benefits and opportunities to athletes, including: (1) the ability to maximize their chances to play in other professional league sports by providing extensive exposure to scouts; (2) the opportunity to compete against the nation's best athletes; (3) national publicity through nationwide broadcasting of sporting events; (4) full and partial scholarships; (5) the opportunity to earn personal sponsorship opportunities and marketing deals; (6) the ability to capitalize on NIL

agreements, which sometimes provide millions of dollars in financial benefits; (7) Revenue Sharing opportunities; and (8) receipt of top-tier academic support through student-athlete assistance programs.

96. The most talented student-athletes have no practical alternatives to participating in NCAA Division I athletics.

97. The NCAA has sole rule-making authority and maintains exclusive power over the promulgation of rules and regulations for its member institutions.

98. The NCAA has violated antitrust law by monopolizing and continuing to attempt to monopolize the market for athletes in NCAA Division I college sports. Specifically, the NCAA wields and is unlawfully protecting monopoly levels of market power that it uses to depress and foreclose competition in the labor market for Division I college athletes.

99. To the extent that Plaintiffs plead submarkets at this stage, Plaintiffs allege that for each sport and gender market, the relevant geographic market is the United States. The NCAA controls rules for competitors and competition in nationwide labor markets for all Division I college athletes, including for each sport and gender. The restraints at issue affect national markets for each sport and gender as member institutions recruit and compete for talent across state lines. Accordingly, the relevant labor market extends throughout the United States.

100. Plaintiffs challenge several aspects of the NCAA's eligibility bylaws: the age based five-year window, the arbitrarily selected three exceptions to the age-based window, and the lack of any other exceptions. Together these restraints work separately and together to artificially restrict certain student athletes by age while allowing arbitrary categories of

exceptions to the age cap, and no other exceptions whatsoever. In doing so the NCAA, without legitimate justification and/or by means arbitrarily stricter than necessary, punishes college athletes who must for any reason (except for the three arbitrarily allowed reasons the NCAA selected) delay their enrollment in college or take a season off after college begins.

101. These restrictions inflict direct harm on college athletes, distort labor markets, and diminish the quality of competition, directly undermining the NCAA's stated mission of supporting college athletes and violating the core principles of federal antitrust law.

102. The NCAA, by and through its officers, directors, employees, agents or other representatives together with its member institutions and along with potential co-conspirators, through imposition and enforcement of unjustified and anticompetitive eligibility restrictions has also entered into an unlawful contract, combination, or conspiracy by:

a. agreeing to artificially fix, depress, maintain, and/or stabilize prices paid to Plaintiffs and class members for the use of their names, images and/or likenesses;

b. agreeing to artificially fix, depress, maintain, and/or stabilize prices paid to Plaintiffs and class members for their athletic services;

c. agreeing to artificially fix, depress, maintain, and/or stabilize the number and terms of scholarships available to Plaintiffs and class members; and

d. agreeing to NCAA Bylaws through which the unlawful contract, combination, or conspiracy may be implemented and monitored.

103. The activities described above have been engaged in by the NCAA and its co-conspirators for the purpose of effectuating the unlawful agreement.

104. The NCAA's actions constitute an unreasonable restraint of trade.

105. Plaintiffs bring this action to halt the NCAA's unjustified and anticompetitive age restrictions and arbitrary exceptions, to restore fair competition and protect the

economic opportunities of Division I college athletes. Plaintiffs request an injunction permanently restraining the NCAA from enforcing the Age-Based Rule and providing remedial monetary compensation (damages) to Plaintiffs and putative class members who have been injured by the NCAA's anticompetitive age-based restrictions.

## IX. CLASS ALLEGATIONS

106. Plaintiffs DeJuan Campbell, Laila Jewett, and Sebastian Mexico bring this action under Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on their own behalf and on behalf of the following Classes:

> **Rule 23(b)(2) Injunctive Relief Class**:
>
> All student athletes in the United States who began to play in collegiate sports before the 2022-2023 season, exhausted four years of Division I NCAA athletic eligibility by the end of the 2025-2026 academic year and are thus not eligible for a fifth year of NCAA athletic competition under the Age-Based Rule adopted by the NCAA in June 2026.[49]
>
> **Rule 23(b)(3) Damages Class**:
>
> All student athletes in the United States who exhausted four years of Division I NCAA athletic eligibility by the end of the 2025-2026 academic year and are thus not eligible for a fifth year of NCAA athletic competition under the Age-Based Rule adopted by the NCAA in June 2026.
>
> Both the Injunctive Relief Classes and the Damages Classes ("the Classes") exclude the officers, directors, and employees of Defendant. The Classes also exclude all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

[49] Plaintiffs have defined the injunctive relief class in this case to avoid overlapping with the injunctive class in *Wisne*, which was recently certified and granted a preliminary injunction. The only difference between the injunctive relief class defined in this complaint and that in *Wisne* action is the *Wisne* b(2) class includes only students that began to play collegiate sports in 2022-23 while the injunctive class definition in this case includes athletes that began their college playing careers *before* 2022-23 (but, like *Wisne*, finished their respective four years of playing eligibility under the old rules in 2025-26).

107. On behalf of the previously defined Classes, Plaintiffs request an injunction permanently restraining Defendant from enforcing all of their unlawful and anticompetitive rules that restrict eligibility by age, with only arbitrarily selected exceptions, all of which restrict scholarship and NIL opportunities available to Plaintiffs and class members.

108. On behalf of the proposed Classes, Plaintiffs seek, among other types of potential damages, compensation and benefits class members would have received, including through NIL opportunities and institutional revenue-sharing agreements, absent Defendant's unlawful restrictions on their edibility to compete.

109. The Classes are so numerous that joinder of all members is impracticable. While the exact number of members in each of the Classes is unknown to Plaintiffs at this time and can only be discerned through discovery, Plaintiffs are informed and believe that there are several thousand members of the Classes. Plaintiffs are informed and believe that the class members' identities may be ascertained through records maintained by the NCAA.

110. Plaintiffs' claims are typical of the claims of the other members of the Classes. Plaintiffs and other members of the Classes sustained damages arising out of Defendant's common course of conduct in violation of law alleged herein. The injuries and damages of each member of the Classes were directly caused by Defendant's wrongful conduct in violation of laws as alleged herein.

111. Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

112. Numerous common questions of law and fact exist as to all members of the Classes, and these common questions predominate over any questions affecting solely

individual members of the Classes. Among the predominant questions of law and fact common to the Classes are:

a. Whether the NCAA entered into an unlawful contract, combination, or conspiracy by agreeing to artificially fix, depress, maintain, and/or stabilize Division I athlete opportunities for NIL;

b. Whether the NCAA unreasonably established and/or maintained monopoly levels of market power by limiting and continuing to limit the field of athletes eligible for NIL payment and other remuneration, and rewards related to performance and participation in NCAA athletics;

c. Whether the conduct of the NCAA and any co-conspirator caused members of the Classes to receive less compensation than members of the Classes would have received in the absence of the Defendant's unjustified and anticompetitive restrictions; and

d. Whether the Classes are entitled to, among other things, declaratory and injunctive relief and, if so, the nature and extent of such relief.

113. Plaintiffs' claims are typical of the class members because the restraints on their eligibility and, thereby, their compensation have injured both Plaintiffs and the members of the Classes.

114. Plaintiffs are adequate representatives of the Classes and will protect the claims and interests of the Classes. Plaintiffs do not have interests that conflict with those of the Classes and Plaintiffs will vigorously prosecute the claims alleged herein.

115. A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court. The damages suffered by Plaintiffs and each member of the Classes are relatively small as compared to the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent class certification, it would not be feasible for Plaintiffs and members of the Classes to redress the wrongs done to them.

It also would be grossly inefficient for the judicial system to preside over large numbers of individual cases. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

116. Defendant has acted or refused to act on grounds generally applicable to the members of the Classes, thereby making final injunctive relief appropriate for the members of the Classes as a whole.

## X. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1
Unreasonable Restraint of Trade

117. Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

118. The NCAA, through its officers, directors, employees, agents or other representatives together with its member institutions and along with other potential co-conspirators, has entered into and enforced an unlawful agreement to restrain and suppress competition in the relevant markets through application of the Age-Based Rule to bar athletes such as Plaintiffs and members of the classes from eligibility to compete due to age-based and transition provisions.

119. The Age-Based Rule operates as an illegal agreement to restrain trade, unreasonably restricting the ability of Division I college athletes to compete in a full five years of competition, and thereby restricting athletes' exposure necessary to earn NIL. The

threat posed by the NCAA having license to bar student-athletes from realizing the opportunities they have earned without logical justification stifles the market's ability to flourish.

120. The unlawful horizontal agreement unreasonably restrains competition for college athlete services. By arbitrarily restricting college athletes to a capped age-based five-year window of eligibility to compete denies college athletes NIL compensation opportunities. It further reduces athlete visibility to professional scouts and diminishes athletes' present and potential future earning potential.

121. Absent these restrictions, schools would compete more vigorously for college athletes. The arbitrary age cap will and does directly suppress that competition, inflicting antitrust injury on named Plaintiffs and members of the classes.

122. As a direct result of the NCAA's banning of athletes from competition under the Age-Based Rule, due to age-based and transition provisions and who are otherwise eligible, the NCAA will establish a precedent that it may unreasonably restrict student-athletes' ability to participate in the relevant labor market.

123. The NCAA's position results in no procompetitive benefits in Division I collegiate athletics for the NCAA's member institutions, college athletes, or consumers of NCAA athletic contests. Indeed, the NCAA's position is logically inconsistent with its own decision to grant student-athletes blanket waivers to the age caps in cases of pregnancy, missionary/service work, and military service.

124. The NCAA's anticompetitive acts were intentionally directed at the United States market and have had a substantial and foreseeable effect on interstate commerce.

## SECOND CLAIM FOR RELIEF

**Violation of Section 2 of the Sherman Act – 15 U.S.C. § 2**

125. Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

126. Defendant, through its officers, directors, employees, agents, or other representatives, and member institutions has individually and collectively worked to establish, maintain, and exercise unlawful levels of monopoly market power resulting in, among other things, (a) increased prices charged by the NCAA and affiliated market participants at the expense of athletes and (b) depressed wages, salaries, and other remuneration avenues otherwise due to Plaintiffs and putative class members absent the alleged misconduct in this case.

127. Defendant's unlawful conduct has restricted and deprived Plaintiffs and putative class members of scholarship opportunities and compensation for the use of their NIL and will continue to do so. This unlawful conduct has artificially limited supply and depressed compensation paid to Plaintiffs and the members of the Classes for, among other things, the use of their NIL and for their athletic services.

128. Plaintiffs and the members of the Classes have, among other things, received less than they otherwise would have received for the use of their NIL and their athletic services and in a competitive marketplace, were thus damaged, and seek to recover for those damages.

129. Defendant's restrictions on the compensation rights of current and former student-athletes have nothing to do with any legitimate non-commercial objective. The real purpose of these rules is to maximize revenue for the NCAA, its member schools, and their

commercial partners. These restrictions are not about preserving "amateurism" or advancing any legitimate procompetitive goal. They are direct restraints on commercial activity and compensation in the marketplace. The NCAA is regulating economic markets for its own financial benefit, making its conduct unlawful.

130. Defendant's unlawful scheme has directly caused financial harm to Plaintiffs and the members of the Classes. Because of Defendant's conduct, student athletes received less compensation for their NIL rights and athletic services than they would have earned in a competitive market. These are exactly the kinds of injuries the antitrust laws are meant to prevent. The harm flows directly from Defendant's efforts to suppress competition and restrict what athletes could receive for the commercial value they created.

131. The anticompetitive effects of Defendant's scheme substantially outweigh any alleged procompetitive effects that may be offered by Defendant's including that their collusive conduct is shielded by the NCAA's concept of "amateurism." Moreover, reasonable and less restrictive alternatives are available to Defendant's current anticompetitive practices.

132. The amount of damages suffered by Plaintiffs and the members of the Classes has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, Plaintiffs are entitled to recover from Defendant's treble the amount of actual damages, as well as an award of reasonable attorneys' fees and costs of suit.

133. Plaintiffs and members of the Classes are entitled to a permanent injunction that terminates the ongoing violations alleged in this Complaint.

## XI. REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, request judgment as follows:

A. For actual damages according to the proof at trial;

B. For treble damages pursuant to 15 U.S.C. § 15;

C. For a judgment declaring as void the NCAA's eligibility Bylaws that operate to impose eligibility restrictions that work to restrict or eliminate the compensation Division I athletes can receive from a fifth year of eligible athletic competition;

D. For an injunction restraining the NCAA from enforcing its unlawful and anticompetitive agreement to restrict the compensation available to Division I athletes denied a fifth year of eligibility, including opening the transfer portal to allow eligible athletes to participate in the relevant market;

E. For Plaintiffs' attorneys' fees, costs, and expenses; and

F. For other such relief that the Court may deem just and equitable.

## XII. JURY DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, hereby request a jury trial on any and all claims so triable.

Dated: August 10, 2026

Respectfully submitted,

By: */s/ Justin N. Boley*

Kenneth A. Wexler
Justin N. Boley
Melinda J. Morales
Margaret Shadid
Andrew D. Yoder
**WEXLER BOLEY & ELGERSMA LLP**
311 S. Wacker Drive, Suite 5450
Chicago, Illinois, 60606
Tel: (312) 346-2222

Fax: (312) 346-0022
kaw@wbe-llp.com
jnb@wbe-llp.com
mjm@wbe-llp.com
ms@wbe-llp.com
ay@wbe-llp.com

Daniel E. Gustafson, MN Bar No. 202241
Emily B. Egart, MN Bar No. 0505660
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
eegart@gustafsongluek.com

Dennis Stewart, CA Bar No. 99152
**GUSTAFSON GLUEK PLLC**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 595-3299
dstewart@gustafsongluek.com

Jeffrey L. Kodroff
5 Sentry Parkway, Unit 160
Blue Bell, PA 19422
jeffrey.kodroff@gmail.com